**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

CHARICK S. CALLAWAY,

    Petitioner,

    v.

                      Civil Action No.: PWG-21-316

JEFF NINE,

    Respondent.

**MEMORANDUM OPINION**

On February 8, 2021, self-represented Petitioner Charick S. Callaway filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. ECF No. 1. Respondent filed a limited response on September 10, 2021 (ECF No. 15), which was supplemented on April 7, 2022 (ECF No. 20) pursuant to an Order issued by this Court (ECF No. 19). Also pending are Mr. Callaway's Motion for Discovery and to Appoint Counsel (ECF No. 16) and a Motion for Extension of Time to file a Reply (ECF No. 17). No hearing is necessary to resolve the pending motions. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2021); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)). For the reasons set forth below, Mr. Callaway's Petition and pending motions shall be denied and a certificate of appealability shall not issue.

**BACKGROUND**

**A.  Trial**

Mr. Callaway is serving a sentence of life plus eighteen years consecutive followed by a five-year term of probation,[1] after he was convicted by a jury in the Circuit Court for Baltimore

---

[1] Callaway was also given a life sentence for the first-degree sex offense which was suspended and he received a five-year term of probation. ECF No. 20-17 at 108.

City on charges of first-degree rape, first-degree sex offense, wearing and carrying a deadly weapon, first-degree burglary, and robbery with a deadly weapon. *See* ECF No. 15-1 at 221 (Md. Court of Spec. App. Op.); ECF No. 20-17 at 107-109 (sentencing transcript).[2] The underlying facts of Mr. Callaway's offenses were summarized by the Maryland Court of Special Appeals in its opinion denying relief on direct appeal.

> On May 27, 2013, at around 2:45 a.m., the victim left her job working at a bar and lounge near 930 North Charles Street in Baltimore, went to a convenience store/market, then walked home. While she was speaking with her ex-boyfriend on her cellphone, a man came up behind her and held a knife to her neck. The victim identified appellant, in court, as that man.

> After she screamed, appellant took her cellphone and told her to continue to enter her basement apartment. According to the victim, appellant threatened to "slit my neck from ear to ear." The victim gave appellant close to $1,000 and asked him to leave. Instead, appellant forced his penis into her mouth, then forced her, still at knifepoint, into the kitchen.

> Realizing that she was about to be raped, the victim convinced appellant to wear a condom, located in a nearby drawer. The appellant then "threw me up against the kitchen wall, pushed me up against the kitchen wall and he raped me."

> Afterwards, appellant made the victim take a shower and clean any areas that he touched with bleach. He also had her clean the outside stairway leading into her apartment. Appellant then took the victim outside and started walking down the street. He eventually let her go, returning her phone, but keeping the stolen money. The victim then ran, called her ex-boyfriend, and told him that she had just been raped. The police were contacted and, after her ex-boyfriend and mother arrived at her residence, the victim was transported to Mercy Medical Center for a sexual assault forensic examination.

> The presence of seminal fluid and sperm were detected on several swabs taken from the victim's vaginal/cervical areas and external genitalia. After comparison, an expert in DNA analysis opined that appellant was the source of the DNA found on the sperm fraction from the vaginal/cervical swab. His DNA was also present in several other swabs taken from the victim, including, but not limited to, the sperm fraction from the swab of the victim's external genitalia.

---

[2]     Page cites refer to the page numbers assigned by the Court's electronic docketing system and may not correspond to the pages given on paper copies of the record.

Several days later, Sergeant Kerry Snead, of the Sex Offense Unit for the Baltimore City Police, showed the victim a photographic array. The victim identified a photograph of appellant, signed the array, and wrote on the back of the array, "[t]he man on the front attacked me at my front door. He put a knife to my neck, forced me inside. He robbed me and raped me. He made me shower and bleach the surfaces he touched. He then made me help him escape."

The victim's landlord, Amy Cieto, gave Sergeant Snead video recordings from four surveillance cameras associated with the residence. As the video played for the jury, the victim narrated the events depicted therein. The victim identified appellant in the video, testifying that the video showed him holding the back of her shirt and walking her into her apartment. She also testified that the video showed appellant carrying a knife in his right hand.

The jury was also shown closed circuit television ("CCTV") surveillance taken from the Baltimore City Watch cameras from the same evening. The victim identified herself on that video as well.

Nicolas Antivero, the victim's ex-boyfriend, confirmed that he was on the phone with the victim at around the time of this incident. He heard her say "oh my God, oh my God" right before they were disconnected. Antivero woke up the victim's mother, who also testified at trial, and the two of them drove over to the victim's house, all the while trying to contact the victim on her cellphone. As they got closer, the victim called Antivero, crying and telling him that she had just been robbed and raped. The victim also told her mother the same thing after they arrived, and the victim's mother then contacted the police.

Sergeant Snead, the primary investigator in this case, testified that he first went to the victim's residence and obtained a surveillance video from the landlord. That video depicted the victim and a suspect near the property. Snead used a still image from this video to create a wanted flyer to distribute around the neighborhood and nearby police departments.

After speaking with the victim and walking her route of travel before and after the incident, Sergeant Snead obtained additional surveillance videos. This included, but was not limited to, video from William Snyder, the general manager from the nearby Belvedere Condominiums, formerly the Belvedere Hotel. Sergeant Snead testified, without objection, that this video showed an "individual matching the physical and clothing description as the same description that was put out from the flyer, from that footage from the house[,]" meaning the surveillance video from the victim's landlord. And, according to Snyder, that video depicted appellant walking in an adjacent alley, up to the front door of the Belvedere, through the lobby, and then taking an elevator to appellant's 11th floor rented office. After obtaining the video from the Belvedere, and learning appellant's name and address, Sergeant Snead prepared

a photograph array. Snead confirmed that the victim identified appellant in that
array as the man who robbed and raped her.

Sergeant Snead further testified that he obtained surveillance video of the scene
at the time in question from the City Watch CCTV system. As will be discussed
further, although appellant objected at various times to Snead's narration as
those videos were played for the jury, certified copies of the recordings were
admitted without any contemporaneous objection.

ECF No. 15-1 at 221-25.

Relevant to the petition pending before this Court, Detective Amy Strand testified

regarding her encounter with Mr. Callaway when he was confined to a holding cell at the police

department.[3] ECF No. 20-8 at 110-124. Sergeant Kerry Snead went to the door of the holding cell

where Mr. Callaway was being held. ECF No. 20-11 at 111. Sergeant Snead recalled that Mr.

Callaway made eye contact with him and jumped up onto the bench inside the cell. *Id*. It was then

that Sergeant Snead noticed that Mr. Callaway had tied shoestrings around his neck in a noose and

had tied the other end to the top of the light fixture. *Id*. As Mr. Callaway jumped forward, Sergeant

Snead caught him and pinned him against the wall as he called for assistance. *Id*. Detective Robert

Bell came in and cut the string from his neck and Sergeant Snead called for emergency medical

assistance. *Id*. at 111-12.

Detective Strand, who was not assigned to Mr. Callaway's case, explained that the holding

cell is adjacent to her desk and several feet away. ECF No. 20-8 at 110-11. Detective Strand heard

the commotion from inside the holding cell area and saw her supervisor, Sergeant Snead, rush

inside. *Id*. at 111. Detective Strand could hear Mr. Callaway crying and saying, "just let me die,

why don't you just let me die." *Id*. Detective Strand went into the area where Mr. Callaway was

being held and "tried to console him" by telling him "whatever's going on it's not worth hurting

---

[3]     Detective Strand first testified outside of the presence of the jury for the purpose of determining the
admissibility Mr. Callaway's statement. *See* ECF No. 20-8 at 110-24 (testimony), 132-33 (court's ruling).

yourself." *Id*. at 112. Detective Strand, testified that Mr. Callaway then said, "I shouldn't have done it to that girl, she didn't deserve that . . . she was a nice girl and she probably wants me dead." *Id*. Detective Strand stayed with Mr. Callaway until the paramedics arrived and reported that she did not ask Mr. Callaway any questions. *Id*. at 113.

Defense counsel argued that Detective Strand's report regarding Mr. Callaway's statement should not be admitted into evidence due to Mr. Callaway's emotional state at the time of his interaction with Detective Strand. ECF No. 20-8 at 125-129. The trial court denied the defense's motion based on the totality of the circumstances noting that, "Detective Strand just happened to be four or five feet away from whatever was going on in that cell and got called in to the circumstances by the fact that there was commotion." *Id*. at 132. The court also noted that there was nothing to suggest that Detective Strand was questioning Mr. Callaway; rather, she "got involved in what was an act of human kindness trying to calm someone down, and the defendant continued speaking." *Id*. at 133.

Sergeant Snead's report referenced Detective Strand's encounter with Mr. Callaway in the holding cell. ECF No. 20-8 at 173. The report stated in pertinent part that "[w]hile speaking to Detective Amy Strand *about an unrelated incident* [Mr. Callaway] told her I didn't mean to do that to that girl. She didn't deserve that. She probably wants me dead." *Id*. (emphasis supplied).

Also relevant to the claims raised by Mr. Callaway here is that he initially raised a defense of Not Criminally Responsible ("NCR") through the first attorney who represented him.[4] Mr. Callaway's trial counsel testified at a post-conviction hearing and explained that the NCR plea was withdrawn after she reviewed all the forensic evaluations of Mr. Callaway which did not support an NCR defense. ECF No. 15-3 at 123. She stated that "it was pretty clear from the reports that

---

[4]     Mr. Callaway was represented by Sharon May at trial and she withdrew the NCR plea.

Callaway was trying to generate an NCR plea." *Id*. She also recalled that Mr. Callaway asked for materials about bipolar disorder and after he received them, he met with a psychiatrist and "apparently gave a full rendition of symptoms of what . . . a bipolar person would be like." *Id*. at 124.

**B.     Direct Appeal**

On direct appeal, appellate counsel argued that: (1) the trial court erred in admitting Detective Strand's testimony regarding what Mr. Callaway said at the police station because it was admitted without context and was "irrelevant and inadmissible"; (2) the trial court abused its discretion when it permitted Sergeant Snead to narrate the events depicted in the CCTV video footage and still photographs; and (3) the trial court erred in admitting the surveillance video footage from the Belvedere without proper authentication. ECF No. 15-1 at 221. The Maryland Court of Special Appeals affirmed Mr. Callaway's convictions in an unpublished opinion. *Id*. at 220-49. The Court rejected Mr. Callaway's first argument because Detective Strand's testimony before the jury was heard after the victim identified Mr. Callaway as the man who raped her and, in the appellate court's view, Detective "Strand's testimony was not totally without context and was, therefore, relevant." *Id*. at 230. The court further found that "the probative value of the evidence was high" and outweighed any prejudicial effect on Mr. Callaway. *Id*.

The Court of Special Appeals also rejected Mr. Callaway's second argument regarding Sergeant Snead's narration of the video footage. Mr. Callaway argued that that narration constituted "inadmissible lay opinion evidence," which the Court of Special Appeals found meritless because Sergeant Snead did not provide an opinion. ECF No. 15-1 at 230. Rather, Sergeant Snead simply "pointed out what in the footage was significant to his investigation, which was helpful to the jury in its understanding of the evidence." *Id*. The court observed that "even

though Sergeant Snead did not observe the events depicting on the surveillance video as they were unfolding, . . . we are persuaded that his familiarity with the areas and streets, gleaned from his experience talking to the victim and canvassing the neighborhood, were a solid foundation for him to narrate the footage in a manner that could be considered, by the circuit court, to be helpful for the jury." *Id*. at 242.

Finally, regarding the admissibility of the surveillance video from the Belvedere Condominiums, the Court of Special Appeals rejected the argument that the video was not properly authenticated. ECF No. 15-1 at 248. In the appellate court's view, there was evidence from the building manager, William Snyder, that a date and time stamp was included "on the main footage" at the Belvedere, and that the video shown in court was acquired by the Baltimore City Police. *Id*. When Mr. Snyder's testimony is considered together with Sergeant Snead's testimony that he contacted Mr. Snyder to determine if any video for the relevant time frame was available, "any issue with the relevance of the footage, absent the date and time stamp, really was one going to its weight, and not its admissibility." *Id*. The Court of Special Appeals concluded that any error concerning this evidence was "harmless beyond a reasonable doubt" and "was not so prejudicial as to undermine the other overwhelming evidence of [Mr. Callaway's] guilt." *Id*. at 249.

Mr. Callaway's filed a Petition for Writ of Certiorari with the Maryland Court of Appeals on December 1, 2016. *See Callaway v. State of Maryland*, No. 2668 (Md. Ct. of App. 2015 Term) at http://casesearch.courts.state.md.us/casesearch/. It was denied on January 23, 2017. *Id.* On March 1, 2016, Mr. Callaway filed a motion for modification of sentence which was held *sub curia*. ECF No. 15-1 at 50.

**C.    Post-Conviction**

Mr. Callaway filed a post-conviction petition on March 2, 2017. ECF No. 15-1 at 55. He filed amended petitions on July 24, 2017, November 7, 2017, January 8, 2018, July 12, 2018, and March 27, 2019. ECF No. 15-1 at 55-58; 250. On January 22, 2018, at a hearing on Mr. Callaway's petition for post-conviction relief, he discharged post-conviction counsel and proceeded pro se. *Id*. at 57.[5] In a Statement of Reasons issued by the Baltimore City Circuit court on July 11, 2019, all requested post-conviction relief was denied. *Id*. at 250-292. Mr. Callaway's application for leave to appeal, filed on August 1, 2019, was denied by the Court of Special Appeals on February 19, 2020. *See id*. at 64 (docket entry); 293-332 (application for leave to appeal).

## D.    Federal Habeas Petition and Associated Motions

Mr. Callaway filed the present Petition on February 8, 2021. ECF No. 1. He raises the following ineffective assistance claims: (1) ineffective assistance of appellate counsel for failing to raise a viable and significant claim of prosecutorial misconduct that was clearly stronger than those presented (ECF No. 1-1 at 2-8); (2) ineffective assistance of trial counsel for failure to (a) object to prosecutorial and police misconduct (*id*. at 10-13); (b) investigate Mr. Callaway's pre-trial forensic evaluation report and raise an affirmative defense (*id*. at 15-25); and (c) move for a mistrial or curative jury instruction based on the inflammatory remarks made by the State's Attorney during closing argument (*id*. at 25-31). Mr. Callaway also claims that the post-conviction court did not provide him with a full and fair hearing (*id*. at 32-34).

Mr. Callaway also filed a Motion for Discovery and to Appoint Counsel (ECF No. 16) and a Motion for Extension of Time to file a reply in support of his Petition (ECF No. 17).

---

[5]     The post-conviction court held additional hearings on Mr. Callaway's post-conviction claims. Respondent filed two post-conviction transcripts for the hearing on January 22, 2018, and April 26, 2019. ECF Nos. 15-2 and 15-3.

**STANDARDS OF REVIEW**

**A.      Federal Habeas Review**

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("Act"), sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447, 455 (2005). The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citations omitted); *see also Virginia v. LeBlanc*, 582 U.S. __, 137 S. Ct. 1726, 1728 (2017); *White v. Woodall,* 572 U.S. 415, 419 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement")). A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (citation omitted). Under the "unreasonable application" analysis

under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Further, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S.290, 301 (2010). "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett,* 559 U.S 766, 773 (2010) (citation omitted).

**B.      Ineffective Assistance of Counsel**

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The second prong requires the Court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id.* at 696.

Because the instant petition is subject to the provisions of the federal habeas statute, 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("Act"), in order to obtain relief on his ineffectiveness claims, the petitioner must show that the adjudication of such claims at the state court level:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(Supp.1997). The Act further provides that:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

§ 2254(e)(1).

As the Supreme Court held in *Strickland v. Washington*, *supra*, "a state court conclusion that counsel rendered effective assistance of counsel is not a finding of fact binding on the federal court to the extent stated by [former] 28 U.S.C. § 2254(d)[ now § 2254(e)(1)]." *Id*. at 698. Rather, "although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254[(e)(1)], . . . both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.* It follows, then, that § 2254(d)(1) applies to the state court's conclusion that the petitioner's trial counsel rendered effective assistance of counsel and this Court may not grant relief on this claim as long as the state court denied the claim based on a reasonable application of the *Strickland* standard to the facts presented in the state court proceeding.

## C.    Procedural Default

Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in post-conviction proceedings or on direct appeal, or by failing to timely note an appeal, the procedural default doctrine applies. *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991) (failure to note timely appeal); *Murray v. Carrier*, 477 U.S. 478, 489-91 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U.S. 41, 46 (1972) (failure to raise claim during post-conviction); *Bradley v. Davis*, 551 F. Supp. 479, 481

11

(D. Md. 1982) (failure to seek leave to appeal denial of post-conviction relief). A procedural default also may occur where a state court declines "to consider the merits [of a claim] on the basis of an adequate and independent state procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999).

As the Fourth Circuit has explained:

If a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim. *See Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). A procedural default also occurs when a habeas petitioner fails to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id*. at 735 n.1.

*Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998).

If a procedural default has occurred, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits, or (2) that failure to consider the claim on the merits would result in a miscarriage of justice, *i.e.* the conviction of one who is actually innocent.[6] *See Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Breard*, 134 F.3d at 620. "Cause" consists of "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim in state court at the appropriate time." *Id*. (quoting *Murray*, 477 U.S. at 488). Even where a petitioner fails to show cause and prejudice for a procedural default, a court must

---

[6]     Habeas petitioners may use an actual innocence claim to excuse the procedural default of a separate constitutional claim upon which they request habeas relief. *See Murray v. Carrier*, 477 U.S. at 496. "[When] a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Id*.; *see also Reid v. True*, 349 F.3d 788, 806 (4th Cir. 2003). Petitioners who wish to use a claim of actual innocence as a gateway to raising an otherwise defaulted constitutional claim must demonstrate by a preponderance of the evidence that a reasonable juror could not have convicted the petitioner in light of the new evidence. *See Buckner v. Polk*, 453 F.3d 195, 199-200 (4th Cir. 2006).

still consider whether it should reach the merits of a petitioner's claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U S. 298, 314 (1995).

## DISCUSSION

### A.    Pending Motions

Mr. Callaway states in his Motion for Discovery and to Appoint Counsel that he requires the assistance of counsel in the event that discovery is authorized by this Court, and asserts that the transcripts for his post-conviction hearings held on August 2 and 3, 2018 are relevant to the claims raised in his Petition. ECF No. 16 at 2-3.

Under Rule 8(c) of the Federal Rules Governing § 2254 Habeas Corpus[7] cases, "[i]f an evidentiary hearing is required the judge shall appoint counsel for a petitioner who qualifies for the appointment of counsel." "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). To be entitled to federal habeas relief, "[t]he question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Id.*, citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000). Because I have determined that no hearing is necessary for consideration of the claims raised by Mr. Callaway, his Motion to Appoint Counsel is denied.

Discovery is not available as a matter of right in habeas corpus cases. *See Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Rule 6(a) of the Rules Governing § 2254 Cases provides, in relevant part, "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." A federal habeas petitioner

---

[7]     *See also* Rule 1(b) permitting this Court to apply any or all of the rules governing §2254 cases to habeas corpus petitions not otherwise covered by the rules.

establishes the requisite good cause to conduct discovery "where specific allegations before the court show reason to believe that the Petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09 (internal quotation marks and citation omitted). "Good cause" requires more than a petitioner's conclusory assertion there may be some undiscovered or undisclosed evidence to support his claim. The rules governing discovery in habeas corpus cases do not countenance "a so-called fishing expedition via discovery, an effort to find evidence to support a claim." *Borden v. Allen*, 646 F.3d 785, 810 n. 31 (11th Cir. 2011); *see also Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (citations and quotations omitted) ("Rule 6 does not sanction fishing expeditions based on a petitioner's conclusory allegations. Conclusory allegations are not enough to warrant discovery under Rule 6; the petitioner must set forth specific allegations of fact."). Because Mr. Callaway does not satisfy this standard, his Motion for Discovery is denied.

Mr. Callaway's Motion for Extension of Time (ECF No. 17) seeks additional time in which to file a Reply to the Respondent's Answer. ECF No. 16. Mr. Callaway has filed a Reply (ECF No. 18); therefore, his motion for extension of time is denied as moot.

## B.     Ineffective Assistance of Appellate Counsel

Mr. Callaway asserts that his appellate counsel failed to raise a claim that would have been more likely to succeed on direct appeal than those raised by counsel. In his view, appellate counsel should have argued that the statement Mr. Callaway made to Detective Strand while he was at the police station was irrelevant, rather than arguing that the probative value was outweighed by the prejudicial impact. ECF No. 1-1 at 3. He explains that the statement at issue came in through Sergeant Snead's testimony, which he maintains amounted to perjury. *Id*. at 4-5.

The statement at issue was made by Mr. Callaway when Detective Strand came into the holding cell area in an attempt to comfort him shortly after his suicide attempt. Mr. Callaway expressed regret and stated, "I shouldn't have done that to that girl. She didn't deserve that." In Sergeant Snead's report of the incident, he indicated that Mr. Callaway was "speaking to Detective Amy Strand about an unrelated incident" when he made the statement in question. *See* ECF No. 20-11 at 173. In Mr. Callaway's view, attributing this statement to the rape with which he was charged amounted to perjury when the phrase "about an unrelated incident" was omitted from Detective Strand's testimony and it should have been excluded. *See* ECF No. 18 at 2-6 (Petitioner's Reply). During a post-conviction hearing, trial counsel Sharon May explained that her motion to suppress the statement included the "unrelated incident" reference in Sergeant Snead's report because the "comment that [Mr. Callaway] made could have been related [to] what [he] did to [his] girlfriend" previously. ECF No. 15-3 at 119. In 2007, Mr. Callaway was convicted of kidnapping his ex-girlfriend and served five-years for the offense. *See* ECF No. 20-11 at 211-16 (argument and ruling by trial court on admissibility of prior offense).

Appellate counsel, Peter F. Rose, testified at the post-conviction hearing. ECF No. 15-2 at 10-44. In reaching its decision to deny relief on this and other grounds based on this claim, the post-conviction court noted that appellate counsel explained his "methodology with respect to structuring his appellate briefs." ECF No. 15-1 at 286. He explained that "he customarily presents questions in an order that makes the case compelling" and "usually arranges the issues in an order that allows the appellate court . . . the greatest ease of reading and understanding." *Id*. The post-conviction court then observed that:

> "The decision whether to raise an issue on appeal is quintessentially a tactical decision of counsel." *Oken v. State*, 343 Md. 256, 271 (1996). Therefore, appellate counsel's representation is not rendered deficient when appellate counsel fails to raise an issue on appeal that is deemed by appellate counsel to

lack merit. *See Jones v. Barnes*, 463 U.S. 745, 749 (1983); *Gross v. State*, 371 Md. 334, 350 (2002). Indeed, "[i]t has been recognized at the appeal level that it is important not to divert the court with weak arguments, but rather that it is more effective for counsel to focus on one central issue or at most a few key issues." *State v. Matthews*, 58 Md. App. 243, 247 (1984). It was within appellate counsel's discretion to decide how to raise the issues and what issues to raise on appeal. *See Barker v. Wingo*, 407 U.S. 514 (1972), *Gross*, 134 Md. App. at 556; *Oken*, 343 Md. at 271.

*Id*.

Mr. Callaway relies on the Fourth Circuit's opinion in *Griffin v. Aiken*, 775 F.2d 1226, 1235-36 (4th Cir. 1985) to support his position that if appellate counsel fails to raise a claim that would have resulted in the conviction being overturned, it is a violation of the Sixth Amendment right to counsel. ECF No. 18 at 2. Based on his reading of that case, he states that this Court "must examine the trial record to determine whether counsel failed to present a significant and obvious issue." *Id*. But *Griffin* does not include that directive—instead, the Fourth Circuit recognized what was then a recent Supreme Court decision that "due process of law requires that a defendant receive effective assistance of counsel on his direct appeal" but that "appellate counsel has no constitutional duty to raise every nonfrivolous issue on appeal if counsel, as a matter of professional judgment, decides not to raise such issue on appeal." *Griffin*, 775 F.2d at 1235 citing *Evitts v. Lucey*, 469 U.S. 387 (1985).

Here, the post-conviction court did not unreasonably apply established federal law, nor was the decision based on an unreasonable determination of the facts in light of the evidence presented. While Mr. Callaway is entitled to his belief that the "unrelated incident" referenced in Sergeant Snead's report was an incident that occurred some six years before, his understanding is not so obvious that any attorney would have seized the opportunity to raise it on appeal. Mr. Callaway's claim that Detective Strand's testimony amounted to perjury because she left out the phrase

"unrelated incident" when relating what Mr. Callaway had said is without merit.[8] The phrase was included in Sergeant Snead's report, not in Detective Strand's. Further, reading the transcript of the trial as a whole, the "unrelated incident" Detective Strand appears to have been discussing with Mr. Callaway was his suicide attempt from moments earlier. *See* ECF No. 20-8 at 112. Finally, Mr. Callaway's assertion that appellate counsel could have argued that the evidence against Mr. Callaway was not so overwhelming that the alleged error in admitting this evidence was not harmless contradicts the Court of Special Appeals' finding that the evidence against Mr. Callaway *was* overwhelming. ECF No. 1-1 at 7.

For those reasons, federal habeas relief on this claim is denied.

## C.  Ineffective Assistance of Trial Counsel

*1.  Failure to object to prosecutorial and police misconduct*

Mr. Callaway alleges that trial counsel was ineffective because she failed to object to the use of "perjured" evidence at the suppression hearing and failed to use Sergeant Snead's testimony to impeach Detective Strand during cross-examination both at the suppression hearing and during the trial. ECF No. 1-1 at 10-13. Mr. Callaway again claims that when Detective Strand testified at trial, she left out the phrase "unrelated incident," which was included in Sergeant Snead's report, and thereby committed perjury which was known to the State's Attorney, Stacie Sawyer. ECF No. 18 at 5-6.

The post-conviction court rejected this claim because trial counsel *did* in fact object to the admission of Detective Strand's statement when she testified at trial—the objection was simply overruled. ECF No. 15-1 at 286-87, *see also* ECF No. 20-9 at 203. In addition, trial counsel cross-

---

[8]     "Common law perjury" is giving a false oath in a judicial proceeding regarding a material matter. *Hourie v. State*, 53 Md. App. 62, 64, 452 A.2d 440, 441 (1982). Materiality is established where the false statement made is capable of changing the course or outcome of the proceedings or the decision-making of the court. *State v. McGaugh*, 472 Md. 168, 206, 244 A.3d 1117, 1139 (2021).

examined Detective Strand about her written report (*see* ECF No. 20-9 at 205-211) and cross-examined Sergeant Snead about the "unrelated incident" statement contained in his report (*see* ECF No. 20-11 at 173). ECF No. 15-1 at 287. The post-conviction court found that Mr. Callaway had failed to rebut "the strong presumption that counsel's conduct falls within the wider range of reasonable professional assistance" as required under *Strickland*, 466 U.S. at 689. *Id*. That analysis is without error and therefore federal habeas relief is denied on this claim.

2.    *Failure to investigate pre-trial forensic evaluation report and raise an affirmative defense*.

Mr. Callaway claims next that trial counsel should have reviewed a pre-trial forensic psychiatric report because it established that he had a clinical diagnosis of "depressive psychosis" at the time of the crime, and that he had a clear history of mental illness. ECF No. 1-1 at 17-19. In addition, Mr. Callaway states that the report supported the possible consumption of a large amount of a caffeinated, alcoholic drink called "Four LoKo" which was deemed a public threat by the FDA because it induces a state of "wide awake drunk." *Id*. at 20-21. Mr. Callaway also states that there was evidence that he used "molly" and had also maintained his cousin drugged him. *Id*. Based on those asserted facts, Mr. Callaway asserts that trial counsel should have put on an affirmative defense of not criminally responsible and/or involuntary intoxication. He adds that trial counsel did not confer with him prior to withdrawing the NCR plea entered on his behalf by her predecessor. *Id*. at 18-19.

Mr. Callaway submitted to a psychiatric evaluation after he entered an NCR plea; the evaluation was performed by doctors at Clifton T. Perkins Hospital Center. ECF No. 20-6 at 27-28. The resulting report found that Mr. Callaway was competent to stand trial and was criminally responsible. *Id*. Based on that report, Mr. Callaway's trial counsel withdrew the NCR plea. *See* ECF No. 15-3 at 120-134. The post-conviction court observed that the "psychiatric evaluation at

Clifton T. Perkins Hospital comports with state and federal constitutional requirements" and that Mr. Callaway was "not constitutionally entitled to an additional psychiatric evaluation, or even one that was favorable." ECF No. 15-1 at 268 (citing *Djadi v. State*, 72 Md. App. 223, 231 (1987)). The post-conviction court further found that declining to advance an NCR defense falls within the ambit of trial strategy and that Mr. Callaway failed to rebut the presumption that counsel used professional judgment to ascertain the best defense to pursue. *Id*.

Mr. Callaway contends that there were other reports that rendered diagnoses that were significant including psychotic depression and bipolar disorder.[9] ECF No. 18 at 11. Based on those reports, Mr. Callaway asserts trial counsel should have pursued the NCR defense. Trial counsel testified at the post-conviction hearing and explained why the NCR defense was abandoned. She recalled that Mr. Callaway had changed his story about what occurred several times and it became clear that Mr. Callaway was attempting to "generate an NCR plea." ECF No. 15-3 at 124. Counsel also recalled that Mr. Callaway had referred her to a witness, Rhonda Baylor, who he claimed would support the defense but when contacted, Ms. Baylor had no interest in testifying and instead provided damaging information about Mr. Callaway. *Id*. at 129-32.

It is clear from the record that trial counsel did not neglect to investigate and research Mr. Callaway's case and that her decisions were professional, informed legal choices. *See Elmore v. Ozmint*, 661 F.3d 783, 858 (4th Cir. 2011). Despite Mr. Callaway's lengthy questioning of trial counsel at the post-conviction hearing, those questions produced no evidence that counsel was not

---

[9]     A viable defense of not criminally responsible requires more than a diagnosis of a mental health disorder. Under Md. Code Ann., Crim. Proc. § 3-109:

> (a) a defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder . . . lacks substantial capacity to:
> > (1) appreciate the criminality of that conduct; or
> > (2) conform that conduct to the requirements of law.

prepared for trial or did not know the fundamental facts and documentary evidence involved. *See* ECF No. 15-3 at 42-120. In light of that evidence, the post-conviction court's conclusion that trial counsel's withdrawal of the NCR plea and decision not to obtain further psychiatric testing were strategic decisions reached through the exercise of professional judgment is without error.

For those reasons, federal habeas relief on this claim is denied.

3.    *Failure to move for mistrial or curative jury instruction.*

This final claim regarding trial counsel is based on the State's Attorney's attempt to offer the jury an explanation of the "unrelated incident" statement. The rebuttal argument at issue was as follows:

> [MS. SAWYER]: While walking to the restroom he expressed to Detective Robert Bell "he knew he was going to jail and this was his first time doing this." While speaking to Amy Strand, "I didn't mean to do that to that girl, she didn't deserve it. She probably wants me dead."
>
> Now when you read the whole thing you will understand that there were numerous times the Defendant talked to the police while he was in custody. Unrelated – talk with Detective Bell – unrelated to talking to Sergeant Snead he talked to Amy Strand. I didn't mean, or I shouldn't have done that to that girl, she didn't deserve it. She probably wants me dead. That's unrelated.
>
> *To suggest otherwise, then you have to start wondering what other female did he hurt.*
>
> [MS. MAY]: Objection.
>
> [THE COURT]: Sustained, *let's focus on this one*.

ECF No. 20-12 at 93 (emphasis supplied).

Mr. Callaway contends that this amounted to prosecutorial misconduct and judicial bias. According to Mr. Callaway, trial counsel's objection was insufficient because the State's Attorney improperly referenced his prior conviction and the trial court added to the damage with the editorial comment it provided. ECF No. 1-1 at 28-29.

The post-conviction court correctly observed that attorneys are afforded great leeway during closing arguments and that "[r]eversal is required . . . only where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused." ECF No. 15-1 at 291-292, quoting *State v. Newton*, 230 Md. App. 241, 254 (2016). "As other courts have noted, refraining from objecting to avoid irritating the jury is a standard trial tactic." *Bennett v. Angelone*, 92 F.3d 1336, 1349 (4th Cir. 1996) *see also Sigmon v. Stirling*, 956 F.3d 183, 195 (4th Cir. 2020), *as amended* (Apr. 15, 2020), *cert. denied,* 141 S.Ct. 1094 (2021) (noting defense counsel's decision to avoid objecting during closing argument amounted to a strategic choice which is virtually unchallengeable).

The post-conviction court also noted that the Court of Special Appeals addressed this issue in *State v. Newton*, 230 Md. App. 241, 254 (2016), where it "stat[ed] as a general rule, it is within the range of legitimate argument for counsel to state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence; and such comments or argument is afforded wide range." ECF No. 15-1 at 291. Although defense counsel's objection was sustained, there was no basis for a motion for mistrial based on what the State's Attorney said in rebuttal closing argument. Counsel's performance in refraining from seeking a mistrial was therefore not deficient. Under *Strickland* there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The failure to make a frivolous motion does not establish that there was an unprofessional error, nor is there even a remote possibility that the result of the trial would have been different had the motion been made. *See Horne v. Peyton*, 356 F.2d 631 (4th Cir. 1966) (fact that counsel could have done more is insufficient for reversal absent any showing of harmful consequences). Accordingly, Mr. Callaway's ineffective assistance of counsel claim fails.

**D.      Full and Fair Post-Conviction Hearing**

Finally, Mr. Callaway claims that the post-conviction court did not provide him with a full and fair hearing and also states that he had a mental breakdown during the hearing but did not receive mental health care. ECF No. 1-1 at 32-33. Mr. Callaway acknowledges in his Petition filed with this Court that this claim was not presented to a State court. ECF No. 1 at 6.[10] Respondent contends that this claim is unexhausted and procedurally defaulted. ECF No. 15 at 32.

This Court "is precluded from reviewing the merits of a constitutional claim that the state refused to consider on the merits 'pursuant to an independent and adequate state procedural rule, . . . unless the [petitioner] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Brown v. Lee*, 319 F.3d 162, 169 (4th Cir. 2003) quoting *Coleman*, 501 U.S. at 750. Mr. Callaway may not now return to the post-conviction court to raise this claim because he could have raised in his application for leave to appeal but did not. *See* Md. Code Ann., Crim. Proc. § 7-106(b). The claim is therefore procedurally defaulted.

Mr. Callaway asserts that this Court's failure to consider the merits of this claim would result in a fundamental miscarriage of justice, but he does not explain why, nor does he offer an explanation for why this claim was not raised in his application for leave to appeal. ECF No. 18 at 13-14. The fundamental miscarriage of justice exception is limited to cases where "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence" and "no reasonable fact-finder would have found the petitioner guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B). Mr. Callaway's assertion that he was not provided with a full

---

[10]     Mr. Callaway's application for leave to appeal the denial of post-conviction relief did not assert that he was denied a fair hearing. *See* ECF No. 15-1 at 293-332.

and fair hearing at post-conviction does not fall within that narrow category. Accordingly, this Court declines to address the merits of this claim.

## CONCLUSION

Because this Court is denying relief on all the claims asserted, a certificate of appealability must be considered. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, 137 S.Ct. 759, 773 (February 22, 2017). The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because this Court finds that there has been no substantial showing of the denial of a constitutional right in connection with the claims adjudicated herein, a certificate of appealability shall not issue. *See* 28 U. S.C.§ 2253(c)(2). Mr. Callaway may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate. *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

A separate Order follows.

 _7/11/2022_____                          _____/s/_____
Date                                          Paul W. Grimm
                                              United States District Judge